09-90045-am
In re DeMarco

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2013
(Decided: October 4, 2013)

Docket No. 09-90045-am

_____

In re Mario DeMarco,

> *Attorney*.

_____

Before:

Cabranes, Sack, and Wesley, *Circuit Judges*.

_____

This Court's Committee on Admissions and Grievances has recommended

that Mario DeMarco, an attorney admitted to the bar of this Court, be disciplined.

We adopt the Committee's recommendations and findings of fact, with certain

exceptions, and publicly reprimand DeMarco for his misconduct in this Court.

_____

For Mario DeMarco:           Mario DeMarco, Esq.,
                     Port Chester, New York.

**PER CURIAM**:

Pursuant to this Court's Local Rule 46.2, it is hereby **ORDERED, ADJUDGED, AND DECREED** that Mario DeMarco is PUBLICLY REPRIMANDED for the misconduct described in the appended report of this Court's Committee on Admissions and Grievances ("the Committee"), except as discussed below.

## I. Summary of Proceedings

By order filed in April 2009, this Court referred DeMarco to the Committee for investigation of the matters described in that order and preparation of a report on whether he should be subject to disciplinary or other corrective measures. During the Committee's proceedings, DeMarco had the opportunity to address the Court's referral order and to testify under oath at hearings held in September 2009, April 2010, and June 2011. DeMarco proceeded *pro se* before the Committee.

Although a draft Committee report and recommendation was prepared after the second hearing, a dissenting Committee member requested that additional evidence be obtained and, as a result, the Committee reopened the

2

proceeding to hear additional testimony from DeMarco and from a new witness. *See* Committee Report at 2.  After that third hearing, a new draft Committee report was prepared. However, one Committee member dissented in part from the Committee report and recommendation in a separate "minority report."  The minority report caused the Committee to meet in plenary session and, after discussing the issues raised by the minority report, the full Committee adopted the majority's report and recommendation (the "Committee Report") by a vote of 8 to 1 with one member absent.  *See* Addendum to Report.

In January 2012, the Committee filed with the Court the record of the Committee's proceedings, the Committee Report, the minority report, and the addendum to the Committee Report.  Thereafter, the Court provided DeMarco with a copy of the reports, and DeMarco responded.

In the Committee Report, the Committee concluded that there was clear and convincing evidence that DeMarco had engaged in misconduct warranting the imposition of discipline.  *See* Committee Report at 14-15.  Specifically, the Committee found that DeMarco had: (a) in two companion cases (referred to here as the "*Morales* cases"), failed to timely file petitions for review and submitted deficient briefs which did not address an issue that the Court had instructed

3

DeMarco to address,[1] (b) failed to timely file this Court's "Form C/A" in eleven cases, and (c) failed to timely file a brief in ten cases. *Id*. at 5-12. After considering various aggravating and mitigating factors, *id*. at 13-15, 16, the Committee recommended that DeMarco be publicly reprimanded and be required, *inter alia*, to submit periodic status reports concerning his legal practice, *id*. at 15-16.

The minority report concurred with the Committee's conclusion that DeMarco had violated various professional obligations, but dissented from several findings of the Committee and the Committee's recommendation. The minority report recommended that DeMarco be suspended for at least two years, in addition to being publicly reprimanded. Minority Report at 56. The disagreement with the Committee Report primarily related to the dissenting member's conclusions that DeMarco had been directly responsible for the misconduct at issue, as opposed to merely failing to adequately supervise his

---

[1] The two cases were *Morales Veliz v. Mukasey*, No. 06-0780, and *Morales v. Mukasey*, No. 06-0781. The Court had instructed DeMarco to address whether enforcement of the thirty-day statutory deadline for filing the petitions for review would constitute a suspension of the writ of habeas corpus, in violation of the Suspension Clause of the United States Constitution. The two deficient briefs were filed in April and May 2007.

staff, and had knowingly made false statements to the Committee and this Court regarding his failure to comply with filing deadlines and other Court orders. *Id.* at 2.

In his response to the Committee Report, DeMarco objected to the Committee's recommendation of public reprimand. *See* Response to Report. However, DeMarco did not address the Committee minority's recommendation that DeMarco be suspended, *id.*, although he had been advised by the Court that "the form and degree of discipline that may be imposed by the Court is not limited to that recommended by the Committee," *see* Order Requiring Response to Report.

## II. Credibility Determinations

We give "particular deference" to the factual findings of the Committee members who presided over an attorney disciplinary hearing where those findings are based on demeanor-based credibility determinations, and somewhat lesser deference to credibility findings based on an analysis of a witness's testimony. *See In re Payne*, 707 F.3d 195, 201-02 (2d Cir. 2013).

In the present case, the Committee majority and minority disagreed over DeMarco's credibility, based on both his demeanor and an analysis of the evidence. While the observations of the minority report are not without force, we

see no reason not to accept the credibility assessments reflected in the Committee Report. The totality of the evidence supports the Committee's conclusions that DeMarco's deficient conduct was negligent rather than deliberate, that he did not deliberately mislead the Court or Committee, and that some of the deficient conduct resulted from inadequate supervision of employees rather than his own direct negligence.

## III. Attribution of Fault to Law Firm and Court Employees

### A. Defaults Relating to Intra-Office Communications

First, the testimony of DeMarco, his paralegal, and his former associate, and an affidavit from his former office manager, support a finding that some, but not all, of the defaults and violations of Court orders were caused by one or more of DeMarco's employees who failed to timely pass along mail, to notify DeMarco of deadlines or other directives, or to timely file documents. We see no reason to reject this evidence, although we reach somewhat different conclusions than the Committee. As in any office, DeMarco's delegation of various tasks to subordinates carried with it the risk that subordinates might, on occasion, fail to timely complete a task or pass along important information. Attributing some of the fault to subordinates did not, in this context, suggest an attempt by DeMarco to unfairly blame others for his own errors, particularly since DeMarco conceded

6

that he had failed to properly supervise those subordinates.

However, even where employees were responsible for defaults, we conclude that DeMarco, rather than having only indirect supervisory responsibility, often shared direct responsibility, for the reasons discussed in the following subsections B and C.

## B. Responsibility for the *Morales* Briefs

DeMarco's testimony regarding responsibility for the *Morales* briefs changed over the course of the hearings. When asked why he had failed to obey the Court's instruction in its March 2007 order to brief the Suspension Clause issue, his first response was that he "wasn't the lead attorney on that brief," though he also suggested that he may have been at least partially responsible, remarking that "[w]e just did not do a good job in that case from top to bottom." Transcript ("Tr.") at 39.

Thereafter, DeMarco testified that he believed that he had been aware of the Court's March 2007 order before his responding April 2007 brief was filed, *id.* at 58, and that he himself had determined that the Suspension Clause issue was irrelevant, *id.* at 59-60. This testimony is then followed by various statements in which DeMarco used both "I" and "we" when referring to the responsible person(s). *Id.* at 60-61, 225. Near the end of the hearings, however, DeMarco

stepped back from his admission of direct responsibility, stating that he was "reasonably certain" that he wasn't the "lead attorney" for the *Morales* cases, and that he didn't "think that[,] having seen [the March 2007 order, he] would have done nothing." *Id.* at 367.

The Committee did not fully accept DeMarco's suggestions that he was not directly responsible for the failure in the *Morales* cases to obey the Court's instruction to brief the Suspension Clause issue – the Committee found it "likely that even if an associate was handling the [*Morales* cases], DeMarco at some point reviewed the brief[s] before filing." Committee Report at 6. However, we see no need for speculation on this point, and we reject DeMarco's assertion that he was not the "lead attorney" for the *Morales* cases.

Instead, we conclude that DeMarco was fully, and directly, responsible for the failure to comply with the Court's instruction in the *Morales* cases, since he was the sole counsel of record for the petitioners and, more important, the sole attorney who signed the deficient briefs. By signing those briefs, with the knowledge that they were to be filed in this Court, DeMarco was certifying – at the very least – that the briefs were in compliance with all relevant rules and orders of the Court, that all facts presented in the briefs were accurate, and that all contentions had an arguable basis in law and fact. *Cf.* Fed. R. Civ. P. 11(b)

8

(detailing attorney's representations to the district court when, *inter alia*, signing a document which is to be filed or otherwise presented to the court).  Thus, regardless of who actually wrote the *Morales* briefs, DeMarco, as the signing attorney, was responsible for their contents.  *See In re Girardi*, 611 F.3d 1027, 1039 (9th Cir. 2010) (reprimanding attorney who authorized others to sign his name on appellate briefs, drafted by another attorney, "for his recklessness in determining whether statements or documents central to an action on which his name appears are false"); *Dube v. Eagle Global Logistics*, 314 F.3d 193, 194, 194 n.1 (5th Cir. 2002) (sanctioning all attorneys who signed noncompliant appellate brief, although some were not formally associated with the law firm representing appellant), vacated as moot (5th Cir. Feb. 4, 2003).

Moreover, the contents of the April and May 2007 briefs themselves belie DeMarco's suggestion – either in defense or mitigation – that he reasonably relied on assurances from the attorney who drafted the briefs that they addressed all necessary issues.  His April 2007 brief, which was filed in response to the Court's March 2007 order directing him to address the Suspension Clause issue, stated that "counsel is fully familiar with the circumstances/facts surrounding said case," and the March 2007 order itself was attached as an exhibit to the April 2007 brief.  At the Committee's hearing, DeMarco identified his signature on the April

9

2007 brief and agreed that, before signing it, he "took steps to be sure [he was] fully familiar" with the facts and circumstances relevant to the case. Tr. at 52; *see also id.* at 388 (acknowledging signing of briefs).

DeMarco's May 2007 brief: (a) stated that it was in response to the government's motion to dismiss, which primarily discussed DeMarco's failure to address the Suspension Clause issue; (b) explicitly acknowledged (with exceptions that are not now relevant) the accuracy of the procedural history found on pages 1 through 3 of the government's motion, where the government described the March 2007 order and stated that DeMarco's April 2007 brief "ma[de] no mention of the Suspension Clause issue on which this Court directed briefing"; and (c) included DeMarco's signed affidavit declaring, under penalty of perjury, that the facts set forth in the May 2007 brief were "true and correct to the best of [his] knowledge and belief."

If, as suggested by some of his testimony, DeMarco's representations in the April and May 2007 briefs were false – *i.e.*, contrary to those representations, he was not aware of the Court's March 2007 order – his representations might have constituted perjury. If, as suggested by some of his other testimony, those representations were true, then he knew that he had been ordered to address the Suspension Clause issue and knowingly failed to do so. Upon review of the

10

record, we take the latter view and conclude that (a) DeMarco knew that, in its March 2007 order, the Court had directed him to address the Suspension Clause issue, and (b) as found by the Committee, he failed to address the issue only because he did not understand its relevance.[2]  Committee Report at 6.

## C.  Failure to Monitor Pending Cases

As counsel of record, DeMarco also was directly responsible for ensuring his cases were proceeding in due course, even if his employees or the Court failed to inform him of deadlines, Court directives, or other important information.  Although counsel of record need not constantly monitor the Court's docket, counsel cannot allow lengthy periods of time to pass without periodic review.  *See Mennen Co. v. Gillette Co.*, 719 F.2d 568, 570 (2d Cir. 1983) ("[I]t is customarily the duty of trial counsel to monitor the docket and to advise himself

---

[2]  A modest amount of research would likely have made clear the relevance of the issue.  For example, although at the time the Court ordered DeMarco to address whether enforcement of the thirty-day filing deadline in his clients' cases would violate the Suspension Clause the issue had not yet been covered by any published decision of this Court, the Court had previously considered whether enforcement of the one-year statute of limitations for habeas corpus petitions challenging criminal convictions constituted a per se violation of the Suspension Clause.  *See Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 113 (2d Cir. 2000)(rejecting Suspension Clause argument); *Rodriguez v. Artuz*, 161 F.3d 763, 764 (2d Cir. 1998)(same).  Additionally, the issue of whether the thirty-day deadline violated the Suspension Clause was raised, but not decided in *Enwonwu v. Gonzales*, 438 F.3d 22, 32, 34 (1st Cir. 2006), and had been discussed in a number of other cases and publications.

when the court enters an order against which he wishes to protest."); *accord United States ex rel. McAllan v. City of New York*, 248 F.3d 48, 53 (2d Cir. 2001) ("parties have an obligation to monitor the docket sheet to inform themselves of the entry of orders they wish to appeal"); *Davila-Alvarez v. Escuela de Medicina Universidad Central del Caribe*, 257 F.3d 58, 65 (1st Cir. 2001) ("[A]n attorney has an ongoing responsibility to inquire into the status of a case.").

The degree of diligence that is due depends upon the circumstances. For example, if a briefing schedule requires an attorney's brief to be filed in one week, and the attorney moves for an extension of time, an attorney exercising due diligence would monitor the docket quite frequently, since denial of the extension motion might leave little time for completing the brief by the original deadline. *See In re OPM Leasing Servs.*, 769 F.2d 911, 916 (2d Cir. 1985) (affirming district court's denial of extension of time to appeal, although parties did not receive copies of ruling and did not anticipate that judge would rule as quickly as he did, because "[c]ounsel should not be encouraged to neglect their duty to monitor the docket on the basis of speculation as to the probable date of decision").

On the other hand, a case that is newly filed in this Court might not, at first, require constant monitoring. But counsel of record for the appellant cannot

12

thereafter allow months to pass before checking the docket, with the excuse that nothing had been received from the Court. Although the Court has a responsibility, to both the parties and the general public, to timely process each case and to notify the parties of all deadlines and other Court directives, the attorneys have their own due diligence responsibility and cannot rely on perfect processing by the Court, postal services, or law firm employees. Thus, while shared blame might be a mitigating factor, *see Mennen*, 719 F.2d at 570 (stating that a failure to monitor the docket "is indeed negligent, but where [an] omission occurs because the party has been misled by action of the court or its officers, such neglect may be excusable"), counsel of record nonetheless bears primary responsibility for staying current with the status of his or her cases.

DeMarco attributed his defaults in several cases to non-receipt of Court orders setting deadlines for the filing of his briefs or other documents. However, in some of those cases, he allowed significant periods of time to pass without determining the status of the cases. Under the circumstances, those periods of neglect were unreasonable, making DeMarco primarily and directly responsible for the delays and the defaults.

For example, DeMarco testified that, in *Thaqi v. Ashcroft*, No. 03-40629, which was commenced in September 2003, he did not receive the April 2004

13

order setting a May 2004 deadline for his brief, and first became aware of his default in the case through his receipt of the October 2005 order dismissing the case based on his default. Tr. at 159-60. Thus, DeMarco failed to inquire as to the status of a case that was, from his perspective, pending over two years without a briefing schedule. Much the same can be said of DeMarco's conduct in *Pochon-Chavez v. INS*, No. 02-4086, where he allowed a year to pass after filing a motion for extension of time to file a brief without filing the brief or making any inquiry, and in *De La Vega v. Gonzales*, No. 03-40164, where he repeatedly missed deadlines by periods of months, despite multiple court orders and filings by the appellee indicating his default.

DeMarco's failure to properly monitor the dockets of the cases discussed above constituted a lack of due diligence on his part, whether or not anyone else also had any such responsibility.

## IV. Misrepresentations to Court

DeMarco conceded that, in two documents filed with the Court, he had incorrectly represented that he had not previously violated any Court orders. Those representations were incorrect because, by that point, DeMarco had failed to timely file a number of briefs and other documents as required by this Court's rules and orders. Despite this history of defaults, we adopt the Committee's

14

finding that DeMarco did not deliberately mislead the Court or Committee concerning his failure to abide by Court rules and orders.

At the time he made the misrepresentations, DeMarco (and an unfortunate number of other attorneys) considered the Court's scheduling orders to be essentially non-mandatory, as not truly *orders* carrying the imprimatur of the judges of this Court. As suggested by the Committee, the Court's overly-generous practice, at the time, of not immediately defaulting cases in which the petitioners had failed to abide by scheduling orders caused a number of attorneys to treat those scheduling orders as something less than mandatory. *See RLI Ins. Co. v. JDJ Marine, Inc.*, 716 F.3d 41, 42-43 (2d Cir. 2013) (per curiam) (noting that, "[a]bout ten years ago," the Court had experienced significant problems calendaring cases, which was the "result of a culture in which the bar had come to believe that the [briefing deadlines] set out in Federal Rule of Appellate Procedure 31(a)(1) were meaningless and that motions for extensions of time ... would be routinely granted time after time," despite the fact that orders granting such motions routinely stated that only extraordinary circumstances would justify another extension).

DeMarco's description of his practice, and of his thought process at the time he submitted that incorrect information to the Court, while awkward, is

15

consistent with the Court's prior experience with this issue. *See* Tr. at 379-86, 391-95, 397. While DeMarco should have known that the information was inaccurate, we accept the Committee's finding that he did not deliberately mislead.[3]

## V. Disposition

We conclude, consistent with our prior disciplinary decisions, that DeMarco's misconduct was sufficiently egregious to warrant a public reprimand.[4] *See In re Payne*, 707 F.3d 195, 207-08 (2d Cir. 2013) (describing prior

---

[3] DeMarco's belief that he had not disobeyed prior orders is also reflected by his assertion in at least two cases where he had defaulted that his non-receipt of scheduling "notices" in those cases meant – employing tortured, but apparently earnestly believed, logic – that the deadlines set by those scheduling orders had not passed. *See Gomez Zuleta v. Ashcroft*, No. 03-40944, DeMarco Letter Dated Aug. 27, 2004 (Record, Tab B, p. 65) (stating that he had "not received the [April 2004] scheduling notice" and, "[a]ccordingly, a deadline to file a brief has not passed"); *De La Vega v. Gonzales*, No. 03-40164, DeMarco Letter Dated July 29, 2004 (Record, Tab B, p. 41) (containing similar language).

[4] We see no reason to address the quality of DeMarco's briefing in *Yacoub v. Holder*, No. 08-3053, which the minority report discussed at length, but which DeMarco did not have an opportunity to address in the proceedings before the Committee. Although we have, in a number of prior disciplinary cases, considered attorney conduct that post-dated the Committee's proceedings without first directing the attorney to address whether that conduct warranted disciplinary action, we see no reason to confront whether it would be appropriate to consider such conduct here, inasmuch as a finding as to the poor quality of DeMarco's briefing in *Yacoub* would have no impact on the final disposition of this case.

Nor do we now consider DeMarco's conduct in *Dolphin Direct Equity Partners v. Interactive Motorsports and Entertainment Corp.* ("*Dolphin*"), No. 09-1359,

16

disciplinary decisions). We agree with the Committee that the mitigating factors in this case are significant enough to warrant reprimand rather than suspension. A public reprimand, particularly when it takes the form of a published decision of this Court that is highly critical of an attorney's conduct, is far more than a "slap on the wrist." Moreover, DeMarco is advised that future misconduct will likely lead to suspension.

Upon due consideration of the Committee's reports, the underlying record, DeMarco's submissions, and the matters discussed above, it is hereby ORDERED that DeMarco is PUBLICLY REPRIMANDED for his misconduct in this Court. It is further ORDERED that DeMarco:

> (a) complete, within one year of the date of this decision, at least six hours of live in-class continuing legal education ("CLE") instruction in law office/practice management. The required CLE classes must be taken in addition to the regular CLE requirements applicable to all members of the New York bar, and taught by CLE providers accredited by that bar. DeMarco must submit information about proposed CLE classes directly to the Committee's secretary, who will inform him whether the Committee agrees that the proposed

where the failure to file certain forms caused the dismissal of the appeal. However, DeMarco is directed to address that default dismissal in his first report to the Committee required by this decision. DeMarco also should explain: why he represented on "Form C" in the later *Dolphin* appeal that the matter had not "been before this Circuit previously," *see Dolphin*, No. 10-1547, Form C, filed Apr. 20, 2010, at 1, and the briefing deficiencies and waiver discussed in the penultimate paragraph of the decision disposing of that later appeal, *see id.*, summary order filed Apr. 6, 2011, at 3.

classes satisfy his obligation.

(b) certify his completion of the above-described CLE classes by sworn statement filed with both this panel and the Committee's secretary within seven days after the end of the one-year period. The Committee may modify the CLE requirements and deadlines, either on motion or *sua sponte*.

(c) submit, for the next two years beginning with the date of this decision, biannual status reports to the Committee's secretary, providing the information described in section VI(B) of the Committee's report and an explanation for any criticism of his conduct by any court or agency during the period covered by each report. The first status report must cover the period beginning with the date of the Committee's report and ending six months from the date of this decision. The remaining three reports must comply with the schedule described in section VI(B) of the Committee's report.[5]

(d) disclose this decision, its appendices, and the other Committee reports to all courts and bars of which he is currently a member, and as required by any bar or court rule or order. DeMarco also must, within fourteen days of the filing of this order, file an affidavit with this Court confirming that he has complied with this disclosure requirement.

Finally, the Clerk of Court is directed to release this decision to the public by posting it on this Court's web site and providing copies to the public in the same manner as all other published decisions of this Court, and to serve a copy

---

[5] DeMarco's first report also must comply with the directives found in note 4, *supra*. If a report required by this order is not timely filed or reveals deficiencies not justified by exigent circumstances, or misconduct of any type, the Committee may recommend the imposition of additional discipline, including but not limited to suspension or disbarment, without hearing further testimony.

on DeMarco, this Court's Committee on Admissions and Grievances, the attorney disciplinary committee for the New York State Appellate Division, Second Department, and all other courts and jurisdictions to which this Court distributes disciplinary decisions in the ordinary course.[6]

---

[6] Counsel to this panel is authorized to provide, upon request, documents from the record of this proceeding to other attorney disciplinary authorities. While we request that all such documents remain confidential to the extent circumstances allow, we of course leave to the discretion of those disciplinary authorities the decision of whether specific documents, or portions of documents, should be made available to any person or the public. All three Committee reports are available to the public with redactions which, *inter alia*, delete the names of several people who were not charged with misconduct and who lacked an opportunity to respond to assertions concerning them.

# APPENDIX 1

## Text of April 2009 Order

For the reasons that follow, Mario DeMarco is referred to this Court's Committee on Admissions and Grievances for investigation of the matters described below and preparation of a report on whether he should be subject to disciplinary or other corrective measures. *See* Second Circuit Local Rule 46(h). We express no opinion here as to an appropriate disposition. The Committee may, of course, in the first instance, determine the appropriate scope of its investigation.

DeMarco was referred to this Panel as a result of his failure, in two cases, to file timely petitions for review from orders of the Board of Immigration Appeals, which resulted in the dismissal of those petitions for lack of jurisdiction, and his inadequate briefing in those cases. *See Morales Veliz v. Mukasey*, No. 06-0780-ag and *Morales v. Mukasey*, No. 06-0781-ag, orders filed June 18, 2008. The Court's orders in those cases stated the following:

> We are troubled by the conduct of petitioner's attorney, Mario DeMarco, in this matter. Despite the notice in a government motion to dismiss that his brief was inadequate, DeMarco submitted a second brief that copied the first, essentially reciting boilerplate, and failed to address the Suspension Clause issue that the Court had ordered briefed. Moreover, DeMarco has explained to the Court that the submission of the late notice of appeal for this petition was a product of a staff member paralegal "miscalculating" the 30-day appeal filing period. We refer the matter of DeMarco's conduct in this case to the Court's Grievance Panel for its determination as to whether the matter should be referred to the Court's Committee on Admissions and Grievances.

*Id.*, at 1, n.2 (identical language in both orders). *See also Shtopaku v. Gonzales*, 03-40637-ag, order filed May 5, 2005 (stating that arguments in brief were not first raised before agency); *Abajlal v. Gonzales*, 06-3242-ag, order filed Apr. 25, 2007 (stating that agency's rationale for denying relief was not addressed in brief); *Marku v. Holder*, 08-2735-ag (Court's limited jurisdiction not discussed in brief).

20

In addition to the two cases noted above, 19 out of the 41 cases in this Court in which DeMarco is listed as the attorney of record reveal instances of DeMarco's difficulty in complying with filing requirements or scheduling orders. *See* cases docketed under 02-4086-ag (after withdrawal without prejudice, Court granted DeMarco's untimely motion to reinstate, but later granted Government motion for summary affirmance), 02-4193-ag (case withdrawn without prejudice after default notice issued), 02-4245-ag (extension motion filed only after default notice issued), 02-4246-ag (case dismissed for failure to file a brief), 03-40164-ag (no timely response to first or second order to show cause why case should not be dismissed for failure to file a brief, later extension motion granted), 03-40629-ag (case dismissed for failure to file brief and subsequent reinstatement motion denied for failure to demonstrate manifest injustice), 03-40944-ag (extension motion filed only after issuance of order to show cause why case should not be dismissed for failure to file brief), 04-3683-ag (default dismissal based on failure to file Form C/A), 04-3780-ag (Form C/A filed only after reminded by Court), 04-4954-ag (same), 04-6339-ag(L) and 04-6368-ag (Con) (same), 05-4658-ag (same), 05-5183-ag (same), 05-6779-ag (same), 07-3055-ag (same), 05-6586-ag (default dismissal for failure to file a brief), 06-1095-ag (same), 06-3242-ag (default dismissal vacated after untimely brief received), 07-0707-ag (Form C/A and agency order filed only after reminded by Court).

[paragraph redacted]

Upon due consideration of the matters described above, it is hereby ORDERED that Mario DeMarco is referred to this Court's Committee on Admissions and Grievances for investigation and preparation of a report, pursuant to Federal Rule of Appellate Procedure 46, this Court's Local Rule 46(h), and the Rules of the Committee on Admissions and Grievances.

[paragraph redacted]

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk
By:_ _____/s/_____
    Michael Zachary
    Counsel to the Grievance Panel

## January 2012 Report of the Committee
## on Admissions and Grievances

### I.     Introduction

By Order dated April 30, 2009, the United States Court of Appeals for the Second Circuit ("the Court") referred Mario DeMarco to this Committee for investigation of his conduct before the Court and for preparation of a report on whether he should be subject to disciplinary or other corrective measures.

The Court's Referral Order raised a number of areas of concern regarding DeMarco's conduct.  First, the Referral Order noted that DeMarco failed to file timely petitions for review from orders of the Board of Immigration Appeals in two cases, resulting in dismissals for lack of jurisdiction.  Second, the Referral Order noted that DeMarco filed an inadequate brief in one of those cases.  Third, the Court noted that DeMarco had difficulty complying with filing requirements or scheduling orders in 19 of the 41 cases he filed in this Court.[1]

The Committee recommends that DeMarco be publicly reprimanded for his conduct.  As further discussed below, the Committee recommends that DeMarco be required to complete no fewer than six hours of CLE in law office management, from a CLE provider accredited by the bar of New York, in addition to the required hours of CLE, and that he be subject to the reporting requirements laid out below.  The following constitutes the Committee's report and recommendation.

### II.     This Disciplinary Proceeding

By letter dated June 8, 2009, and delivered on June 10, 2009, the Committee notified DeMarco of an investigation and provided him an opportunity to

---

[1]  The Referral Order also noted that DeMarco was not admitted to the bar of this Court, but, in fact, DeMarco became a member of the Court's bar in October 2005, so this issue was withdrawn.  The Committee did not address whether DeMarco should have applied for admission sooner than he did.

respond within thirty days. DeMarco did not respond, so the Committee sent a second letter dated July 22, 2009, informing him that if he did not respond, the Committee would proceed without his response. On July 31, 2009, DeMarco filed a response with the Committee ("Letter Response"). That response included a reference to an incorrect docket number, so on August 10, 2009, DeMarco was invited to supplement his response. He did so on August 13, 2009.

A hearing was held on September 18, 2009, conducted by Committee members Eileen Blackwood, Evan A. Davis, Loretta E. Lynch and Michael Patrick (the "Hearing"). DeMarco was present without counsel. The hearing was adjourned without conclusion, so that the Committee could hear from DeMarco's former paralegal, ["Paralegal"], and his current office manager, ["Manager"]. The Hearing resumed on April 16, 2010, before Committee members Eileen Blackwood, Evan A. Davis, and Michael Patrick (who attended by telephone), with testimony by DeMarco and Ms. [Manager]. Although Ms. [Paralegal] had agreed to appear at the Hearing by telephone, when the Committee called her, the phone was answered and then promptly disengaged. Subsequent attempts to contact her over the ensuing hours were unsuccessful. The Hearing was again adjourned without conclusion, and multiple attempts were made to contact her over the next weeks. Contact was made more difficult because Ms. [Paralegal] had, since her termination from DeMarco's employ, moved to Georgia. When it became clear that Ms. [Paralegal] did not intend to cooperate with the Committee, the Committee explored the possibility of compelling her testimony in Georgia. However, Ms. [Manager] had already corroborated some key points of DeMarco's testimony. Ultimately, for a number of reasons, including questions about the ultimate necessity of any testimony she might provide, the Committee decided not to attempt to compel Ms. [Paralegal]'s testimony, and Mr. DeMarco was notified by a letter dated July 26, 2010, that the Hearing was closed. He was given until August 23, 2010, to submit any a post-hearing memorandum, but no memorandum was submitted.

When the hearing panel's draft report and recommendation was circulated, a new member of the panel disagreed with the recommendation and asked that the panel obtain additional evidence. After discussion of those concerns, the Committee decided that the hearing panel should take testimony from a former associate of Mr. DeMarco's, [Associate-A], and should recall Mr. DeMarco to

23

discuss the issue of alleged misrepresentations in certain court filings. The Committee agreed with the majority of the panel that further pursuit of Ms. [Paralegal] was not necessary. The Hearing was then re-opened, and on June 27, 2011, a hearing panel consisting of Evan Davis, Eileen Blackwood, Gerald Walpin, and Michael Patrick (who was not present at the hearing but had a colleague attend who had also been present at prior hearings and reviewed the transcript), took testimony from Mr. [Associate-A] and Mr. DeMarco. At the conclusion of the testimony, the Hearing was adjourned. Mr. DeMarco was asked to submit a response to two questions by affidavit, and that affidavit was received on July 14, 2011.

## III.    Factual Background

The following facts are taken from court records, DeMarco's written submissions and testimony at the Hearing.

DeMarco graduated from Thomas M. Cooley Law School and was admitted to practice law in New York State in July 1993 and in Connecticut in September 1993. He has been admitted to practice before this Court since 2005 and is also admitted to practice before the U.S. District Courts for the Southern and Eastern Districts of New York and the District of Connecticut, as well as the U.S. Courts of Appeals for the Third and Sixth Circuits. Letter Response, at 1.

DeMarco's practice was primarily (95%) immigration law from 1993 to about 2001. Tr. at 4. From 2002 to 2006, he served as corporation counsel for the Village of Port Chester, N.Y. Since then, his practice has been split between immigration, matrimonial, and criminal law. He has had 41 cases in the Second Circuit, all immigration, but by the time of the Hearing, only had one remaining. Tr. at 6.

Until early 2010, DeMarco maintained two offices-one on Long Island and the main office in Port Chester.[2] At one point, DeMarco had as many as three attorneys and four paralegals working for him. By the time of the events under

---

[2] He also maintains office space in Stamford, Connecticut, but it is unstaffed.

consideration here, in 2003, DeMarco employed one other attorney and four paralegals. At the time of the Hearing in 2009, DeMarco had transferred his Long Island paralegal/office manager, [Manager], to Port Chester and employed one part-time attorney and three paralegals, as his office volume had decreased significantly. Tr. at 19-20. By the April 2010 hearing date, he had closed his Long Island office. By the June 2011 hearing date, he employed only two paralegals (one of whom also served as office manager) and one associate attorney.

DeMarco worked primarily out of the Port Chester office, but was at the Long Island office two to three days a week. [Paralegal] was the paralegal/office manager in the Port Chester office and was with DeMarco for twelve years until August 2009, when he terminated her employment. She handled 80% of the immigration work in office, including opening the mail, scheduling, and communicating with the Court. Although the Long Island office maintained a computerized docketing system, the Port Chester office did not use it, relying instead on a manual system maintained by [Paralegal]. [Paralegal] worked independently with little supervision from DeMarco. As his divorce and criminal practice grew, DeMarco concentrated his efforts on those, while his staff handled the immigration practice. [Associate-A] was an associate attorney in the Port Chester office from 2002 to April 2004. Tr. at 288. After Mr. [Associate-A], Mr. DeMarco employed [Associate B] and then [Associate C]. as associates. Tr. at 360-62.

In his 17 years of practice, DeMarco has never been disciplined for professional misconduct.

## IV.    The Legal Standard

Under the Rules of the Committee on Admissions and Grievances for the United States Court of Appeals for the Second Circuit ("Committee Rules"),

> An attorney may be subject to discipline or other corrective measures for any act or omission that violates the rules of professional conduct or responsibility of the state or other jurisdiction where the attorney maintains his or her principal office . . . .   An attorney also may be subject to discipline or other corrective measures for any failure to comply with a

Federal Rule of Appellate Procedure, a Local Rule of the Court, an order or other instruction of the Court, or a rule of professional conduct or responsibility of the Court, or any other conduct unbecoming a member of the bar.

Committee Rule 4; *see also* Fed. R. App. P. 46(c) ("[A] court of appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule.").

"Conduct unbecoming a member of the bar" includes "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice. More specific guidance is provided by case law, applicable court rules, and 'the lore of the profession,' as embodied in codes of professional conduct." *In re Snyder*, 472 U.S. 634, 645, 105 S. Ct. 2874, 2881 (1985).

Because DeMarco was a member of the bar of New York State during the time period at issue, the New York State Code of Professional Responsibility ("the Code") also applies. Two sections are of particular relevance in this matter. First, the Code states that a lawyer shall not "[n]eglect a legal matter entrusted to the lawyer." D.R. 6-101(A)(3); 22 N.Y.C.R.R. § 1200.30(A)(3) (2008); *see also* N.Y. Rules of Prof'l Conduct R. 1.3(b) (effective Apr. 1, 2009). Second, the Code prohibits conduct that "adversely reflects on the lawyer's fitness as a lawyer." D.R. 1-102(A)(7); 22 N.Y.C.R.R. § 1200.3(A)(7); *see also* N.Y. Rules of Prof'l Conduct R. 8.4(h) (effective Apr. 1, 2009).

Courts have consistently treated neglect of client matters and ineffective or incompetent representation as sanctionable conduct. *See, e.g., Gadda v. Ashcroft*, 377 F.3d 934, 940 (9th Cir. 2004), *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 133 (2d Cir. 2004), *Matter of Rabinowitz*, 596 N.Y.S.2d 398, 402 (N.Y. App. Div. 1993), *United States v. Song*, 902 F.2d 609 (7th Cir. 1990), *Matter of Kraft*, 543 N.Y.S.2d 449 (N.Y. App. Div. 1989), *In re Bithoney*, 486 F.2d 319 (1st Cir. 1973). Such conduct is also sanctionable under the applicable professional rules and standards. The American Bar Association's Standards for Imposing Lawyer Sanctions call for a range of sanctions from reprimand to disbarment for various forms of "lack of diligence" and "lack of competence." ABA Standards §§ 4.4,

4.5.  The Disciplinary Rules of New York's Lawyer's Code of Professional Responsibility require that "[a] lawyer shall not . . . [n]eglect a legal matter entrusted to the lawyer," D.R. 6-101(a)(3); *see also* N.Y. Rules of Prof'l Conduct R. 1.3(b) (effective Apr. 1, 2009);  in addition, the Code's Ethical Canons require that the lawyer should represent his or her client "zealously," Canon 7-1, and that he or she "be punctual in fulfilling all professional commitments," Canon 7-38.

"Any finding that an attorney has engaged in misconduct or is otherwise subject to corrective measures must be supported by clear and convincing evidence."  Committee Rule 7(h).  Once misconduct has been established, in determining the sanction to be imposed, the Committee should generally consider: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.  *See* ABA Standards § 3.0.  This Committee may recommend to the Court's Grievance Panel a range of sanctions, including disbarment, suspension, public or private reprimand, monetary sanction, removal from pro bono or Criminal Justice Act panels, referral to other disciplinary bodies, supervision by a special master, counseling or treatment, or "such other disciplinary or corrective measures as the circumstances may warrant."  Committee Rule 6.

## V.     Alleged Misconduct

### A.     The Morales Cases, 06-0780-ag and 06-0781-ag: Failure to File Timely Petition and Inadequate Briefing

The Referral Order noted that DeMarco was referred to the Committee for failure to file timely petitions for review from the BIA and for his inadequate briefing in two companion cases, involving a father and his son.  The Court noted in a 2008 order (identical in both cases):

> We are troubled by the conduct of petitioner's attorney, Mario DeMarco, in this matter.  Despite the notice in a government motion to dismiss that his brief was inadequate, DeMarco submitted a second brief that copied the first, essentially reciting boilerplate, and failed to address the Suspension Clause issue that the Court had ordered briefed.  Moreover, DeMarco has

explained to the Court that the submission of the late notice of appeal for this petition was a product of a staff member paralegal "miscalculating" the 30-day appeal filing period. We refer the matter of DeMarco's conduct in this case to the Court's Grievance Panel for its determination as to whether the matter should be referred to the Court's Committee on Admissions and Grievances.

*Morales Veliz v. Mukasey*, No. 06-0780-ag, at 1, n.2 (June 18, 2008). DeMarco submitted to the Court (and this Committee) an affidavit from [Paralegal] stating that although the petition was due on February 16, 2006, she miscalculated that date as the mailing (not filing) deadline, so the package was deposited in a Federal Express depository on February 16, was picked up by Federal Express on February 17, and delivered to the Court on February 21.[3] Letter Response, Ex. 1. In a Motion to Accept Brief accompanying the affidavit and dated March 30, 2007, DeMarco asserted that the missed deadline caused him "great embarrassment" and said he "takes full responsibility for the error of his paralegal." *Id.* Despite this statement, DeMarco took no steps at that time to change his office procedures or provide more supervision to his paralegal. He did not even adopt in his primary office in Port Chester the more robust docketing system being used in his Long Island office until after receiving this Court's referral order more than two years later. He continued with the same staff and made no changes in his supervision practices at that time. However, DeMarco's office has apparently not missed an initial petition filing deadline since that time.

The timeliness of the petition for review became an issue because the government moved to dismiss the *Morales* cases for failure to file a brief, more than a year after the initial petition was filed. DeMarco has no explanation for his failure to file the initial brief. In denying the government's motion, the Court noted that petitioner had failed to file the petition within the 30-day period and then directed the parties to address "whether this Court's application of the 30-day deadline in this case would constitute a suspension of the writ of habeas

---

[3] It appears that February 17 was a Friday and Monday, February 20 a holiday (President's Day), thus explaining the Federal Express delivery delay until February 21.

corpus, in violation of the Suspension Clause." *Morales* and *Morales Veliz* Order (March 2, 2007). Despite this clear direction from the Court to address a constitutional issue, DeMarco made no mention of it in his brief. When asked why he did not obey the Court's order, DeMarco stated that he "wasn't the lead attorney on that brief;" his associate (whom he supervised) was. Tr. at 39. Originally, he suggested this associate was Mr. [Associate-A], and the Committee therefore decided that [Associate-A] should give evidence about this issue. However, [Associate-A] was not employed by DeMarco after April 2004 and thus was not involved in the Morales cases at the appellate level. Tr. at 288. After the Hearing, DeMarco submitted an affidavit noting that a subsequent employee, [Associate B], was the associate handling the case. Affidavit of Mario DeMarco, dated July 15, 2011. [Associate-A] did testify that he always gave DeMarco a draft to review, Tr. at 299, so it seems likely that even if an associate was handling the case, DeMarco at some point reviewed the brief before filing.

DeMarco also explained that the suspension clause was not addressed because he did not believe the suspension clause was involved in the case, which was a credibility determination in an asylum case. Tr. at 59-60. It appears to the Committee that DeMarco did not understand the Court's point-that it wanted him to address the suspension clause in relation to the dismissal of the petition for untimely filing, not in relation to the underlying issue on appeal. In other words, the Court requested a brief on the question of whether if it did dismiss the petition because of his failure to file within the 30-day period, that dismissal would violate the suspension clause. Even as the Committee took him through each step of this argument, it was clear DeMarco thought the Court was directing him to apply the suspension clause to his underlying issue on appeal, not to the issue of the late filing. In short, he just completely missed the point the Court was making. Tr. at 60-62. Thus, the issue seems less an intentional disregard of the Court's order than a misunderstanding of what the Court wanted.

The dissent quotes at length numerous inconsistent explanations given by DeMarco for why, in the Morales case, his brief did not meet the Court's direction to address the suspension clause issue. While DeMarco is certainly guilty of speculating repeatedly (and inconsistently) to the Committee about the reason for his failures when he clearly does not know or recall why they occurred, the majority disagrees with the dissent that these speculations are an attempt to

29

blame someone else for his mistakes. Repeatedly, throughout DeMarco's testimony, he states that even if one of his employees caused the error, he was responsible for it. Tr. at 9:9-10, 29:11-13; 33:12-16; 367:3-8; 407:10-14; 410-412. His speculations about how the error occurred are not a denial of responsibility.

### B.    Failure to Comply with Filing Requirements or Scheduling Orders

Over the first two days of hearings, the Committee explored with DeMarco 19 other cases the Referral Order identified. The cases fell into two categories-those in which DeMarco failed to file the C/A in a timely manner and those in which he failed to file the brief in a timely manner. Some of the cases were dismissed because of his failures; others were not.

### 1.    Failure to File Timely Form C/A

DeMarco admitted that he failed to file the Form C/A in a timely manner in at least eight or nine cases-that is, not until the Court called or sent his office a letter indicating that the form was overdue. Tr. at 12. At the Hearing, he explained that [Paralegal] handled the scheduling and filing for all cases before this Court. This was corroborated by Ms. [Manager], who also testified that the Port Chester office had no case management or tickler system, other than Ms. [Paralegal]'s own manual calendar. Tr. at 242, 245-46. According to DeMarco, she told him that a court clerk had implied that she could wait until receiving the court's notice to file the form. Certainly, in most cases the Court contacted his office to get the Form C/A before any other action was taken, and DeMarco's office then filed the form. Thus, his office fell into a pattern in which they waited for the Court's notification that the Form C/A was overdue, rather than calendaring the Form C/A for filing within ten days after the petition, as required by the Court's Rules. Tr. at at 83-84. He admitted that even after receiving several notices from the Court that the Form C/A was overdue, he did not direct his staff to change its practices, but continued to wait for the Court to notify him it was overdue. Later, he claimed he did not know his staff was engaging in that practice until receiving the referral order. Tr. at 201-03. Instead, he said that he did not give his paralegal any instruction about appeal procedures, Tr. at 202, i.e., the Rules of Appellate Procedure. Nor did DeMarco regularly keep up with the appellate rules himself, and did not know of the electronic briefing rule until the

30

Court called his paralegal in January 2006. Tr. at 205. [Associate-A] confirmed that he had no familiarity with practice before the Second Circuit. Tr. at 317. It seems to the Committee that DeMarco turned the responsibility for his Second Circuit appellate practice over to his staff without providing them proper guidance or supervision.

In particular, the case of *Grrela v. Ashcroft*, No. 04-3683, was filed on July 1, 2004, and dismissed on April 12, 2006, for failure to file Form C/A. DeMarco explained that the client did not wish to pursue this case, so he allowed it to "die a natural death." Tr. at 170. In addition to not notifying the Court of his intent not to pursue the case, DeMarco did not document the client's decision in writing to the client, but maintained only handwritten file notes of his discussion with the client. He admitted that this practice was probably not the best. Tr. at 1 72-74.

Over a two and a half year period, the Court had to contact DeMarco's office in numerous cases to have him file the Form C/A.

| | |
|---|---|
| *Lopez v. Ashcroft*, 04-4954-ag | Court called DeMarco's office on Sept. 22, 2004 |
| *Komani v. Ashcroft*, 04-6339-ag, | Court called on Dec. 8, 2004 |
| *Komani v. Ashcroft*, 04-6368-ag | Court called on Dec. 9, 2004 |
| *Duarte v. Ashcroft*, 04-3780-ag | Court called on Feb. 11, 2005 |
| *Sotero v. Gonzales*, 05-4658-ag, | Court called on Sept. 12, 2005 |
| *Lopez v. Gonzales*, 05-5183-ag | Court called on Oct. 13, 2005 |
| *Muratovic v. Gonzales*, 05-6779-ag | Court sent notice that C/A overdue on Feb. 14, 2006 |
| *Penaranda v. Gonzales*, 07-3055-ag | Court called after sending notice |
| *Arenas v. Gonzales*, 07-0707-ag | Court called on Feb. 28, 2007 |

In most cases, the Form C/A was then filed within a day or two. DeMarco admitted that his office was essentially using the clerk's office as his tickler system. Tr. at 189. In another case, *Chaves Lopez*, No. 05-5183, although the court left a message for DeMarco to get the Form C/A to the Court by October 14, it was not filed until the 17th.[4] DeMarco claimed he did not personally know

---

[4] October 14 was a Friday, and the 17th a Monday.

about this situation and assumed his paralegal handled it without telling him. Tr. at 201. This seemed credible, as Ms. [Manager] testified that Ms. [Paralegal] admitted to not keeping DeMarco informed on all matters, when Ms. [Manager] confronted her, Tr. at 260. Had she testified, Ms. [Paralegal] may have been able to address whether or not she failed to inform DeMarco of these situations or he personally ignored them. Yet, the Committee felt that obtaining Ms. [Paralegal]'s testimony on the issue was not crucial, as in either case, the responsibility for noncompliance was DeMarco's. DeMarco asserted no personal knowledge of the calls or issue, although messages were sometimes left with his receptionist and other times the clerk spoke with Ms. [Paralegal]. The Court's docket sheets show calls with [Associate-A] and [Paralegal], suggesting that most of the contact was with staff, not directly with DeMarco. The Committee does not find it critical to determine whether DeMarco failed to act directly himself or indirectly through his staff because even if DeMarco was initially unaware of his staff's practice, it is clear that he did not think there was anything wrong with it until he received the Court's Referral Order. He has now acknowledged, that his office's practice not to file the Form C/A until the Court contacted them was "[his] fault and [his] failure." Tr. at 85. Since the Court's Referral Order, DeMarco has apparently been filing the Form C/A as required.

### 2.      Failure to File Timely Briefs

Although in most of the following cases, DeMarco's Letter Response asserted that he did nothing wrong, at the Hearing, DeMarco admitted that he failed to file briefs on time in several cases. At the Hearing, DeMarco did not know the particulars of all the cases, as he said his staff was handling certain cases and he was not personally involved, but he agreed that he was responsible for the actions of his staff. He noted that for several years, 2002-06, he was distracted by his role as corporation counsel for Port Chester, which took considerably more of his time than he expected. [Associate-A] confirmed that DeMarco's general attitude was to get work done on time and to do as good a job as possible. Tr. at 345.

DeMarco asserted that in most of the cases he filed in the Second Circuit, his office had a practice not to rigidly follow the scheduling order, but either 1) to wait until the Court contacted them about the brief being due or 2) to file a

motion for extension of time, and re-calendar the brief deadline to the new date he had requested without waiting for the Court to rule on that motion-in other words, he assumed the motion for extension of time would be granted (and at the time, it appears the Court generally did allow the requested extensions). However, even when he requested an extension, DeMarco rarely complied with the date requested.  In other cases, DeMarco said he was reaching a stipulation with the government and thus did not file the brief, as it did not matter if the case was dismissed because the parties had reached an agreement.  He considered that process as allowing the case to "die a natural death."  Tr. at 117.

It became clear after extensive questioning by panel members that DeMarco did not consider that these practices-allowing cases to "die a natural death," requesting extensions of time and not filing briefs even though the requests had not been acted on, and waiting for court reminders to file the Form C/As-were violating the court's scheduling orders and his obligations as an officer of the court.  Tr. at 133-34.  Because the scheduling order was prepared and sent by court administrative staff, not a judge, DeMarco considered these orders as less compulsory than an order made by a judge.  In fact, the Committee has heard a similar misapprehension from several other respondents.  This lackadaisical approach to court scheduling orders seems to have arisen from a misunderstanding concerning the importance of the scheduling order, combined with practices of the court.  As have some of the other respondents this Committee has met, DeMarco noted that during this time period communications from the court, such as scheduling orders, occasionally were not received, even though they were noted on the court's docket sheet.  [Associate-A] confirmed that communications to and from the Court were not always received. Tr. at 321.  Similarly, [Associate-A], as well as other respondents, have confirmed (and the Court's docket sheets concur) that at this time, the Court generally had allowed appellants' extensions of time without a formal court decision on a motion for extension.  The attorney would file the motion and not file the brief, and after some time, the Court would issue a new scheduling order.  While these practices clearly result in a failure to follow court orders, they appear to have arisen-or at least multiplied-out of misunderstanding and lack of experience with Second Circuit practice, rather than out of intentional neglect.

For example, in *Pouchon-Chavez v. INS*, No. 02-4086-ag, the scheduling

order set the petitioner's brief as due on September 12, 2002. On May 9, 2003 (almost eight months later), the clerk called DeMarco's office to find out why the brief was not filed, as there had been no communication with the Court. [Associate-A] apparently told the clerk that the petitioner was awaiting a ruling on a motion to extend time to file the brief. Although he does not recall the specific case, [Associate-A] confirmed that although today he would call the clerk to inquire about whether filing the motion stayed the due date, at the time, he had no understanding of his obligation. Tr. at 317-18. Although initially in his written response, DeMarco asserted that "[t]his matter involved no wrongdoing" on his part, Letter Response at 2, at the Hearing, he understood that his office had failed to comply and testified that he "was not in the loop on it…. Nobody spoke to me on this one." Tr. at 79. He assumed that his associate was handling the matter. [Associate-A] asserts that although he does not remember the case, he would have told DeMarco about his conversation with the court, Tr. at 333, and it seems likely that he would have. Whether [Associate-A] told him or not, DeMarco remains responsible for his office's failures, and neither he nor [Associate-A] could recall why the brief was not filed on time.

The case was later twice withdrawn without prejudice and reinstated, on each occasion after the time for reinstatement had passed. When asked why the deadlines were missed, DeMarco testified that "we didn't know what we were doing. We were relying on the last experience we had where the time would-the court would allow us to do a stip and then file the brief." Tr. at 82. In other words, because the Court had not dismissed his earlier cases when he missed a brief-filing deadline, he assumed he could ignore the Court's scheduled dates without consequence to the ultimate ability to submit the brief. In his testimony, DeMarco admitted that he should have kept the Court informed and accepted responsibility for his office's failures. Eventually, the case was summarily affirmed "because Petitioner's challenge to the BIA's decision lacks an arguable basis in law or fact." Order of Nov. 23, 2004. DeMarco testified, however, that he had believed there was a basis for appeal, Tr. at 83. Although his conduct apparently did not ultimately prejudice the client, as the case was decided on the merits, the cavalier treatment of deadlines in a case that DeMarco believed had merit is disturbing.

DeMarco gives similar explanations for his conduct in *Benites-Rodriguez v.*

*INS*, No. 02-4193-ag. The scheduling order set his brief as due on September 12, 2002, but it was not filed. A default notice was sent on May 9, 2003. When asked why the brief was not filed, DeMarco responded, "I think we were confident we would at some point down the road get an extension of that date and do it at a later date." Tr. at 92. Notably, no motion for extension of time had been filed. The case was again withdrawn without prejudice and reinstated twice before the Court transferred it to the District of Connecticut where it was decided on its merits, apparently with a successful result for DeMarco's client. Ultimately, DeMarco's client apparently was not prejudiced, but the risk that his lax attitude towards deadlines could have prejudiced this client was substantial. Under the ABA Standards the negligent failure to act with reasonable diligence causing injury or potential injury to the client warrants a public reprimand. ABA Standards § 4.43.

In *Darji v. Ashcroft*, No. 02-4245-ag, a similar pattern shows. The petitioner's brief was due June 25, 2004, but was not filed. On December 7, 2004, the Court issued an order notifying DeMarco that he had to file the brief with a motion to accept it out of time, stipulate to withdraw the petition, or notify his client of possible dismissal. The order explicitly noted that if the case were dismissed, the petitioner would be in jeopardy of removal and DeMarco would be referred to the Court's disciplinary committee.[5] Order of Dec. 17, 2004. The motion to extend time was filed, and a scheduling order set the brief due for January 20, 2005. The brief was filed, but four days after the deadline, on January 24.[6] DeMarco testified that the case was resolved by stipulation in favor of his client, Tr. at 107, so although there was apparently no prejudice to his client, the risk of prejudice to a meritorious case was substantial. Again, DeMarco's written response asserted no wrongdoing, but in testimony, he admitted that his practice of ignoring the deadlines because he was discussing resolution with the

_____

[5] This was actually the fourth such notice issued to DeMarco, although the third he stated that he received from the Court. The first three were in August and November 2004 in the Delavega and Zuleta cases discussed below.

[6] January 20, 2005, was a Thursday, and January 24 a Monday. Notably, it appears as though the government also did not file its brief when due and without any notice to the court either.

government was risky and that this disciplinary proceeding has led him to change his practices. Tr. at 112.

*Jimenez v. Ashcroft*, No. 02-4246-ag, is an example of another questionable practice. The petitioner's brief was due on November 28, 2002. No brief was filed, and a default notice was sent on May 1, 2003, resulting in dismissal of the case on July 21, 2003. DeMarco testified that after the scheduling conference, he determined the case was without merit, and the client consented to let the case lapse. Tr. at 116-17. DeMarco admitted that he improperly did not withdraw or otherwise notify the Court and that he did not even realize that was the proper procedure. Tr. at 117-18. Although he claimed not to have known the details of many of these cases, he did go along with the attitude that if the client was not harmed, all was well that ended well. Tr. at 122. As a result, it became his practice not to file withdrawals, but to make the Court dismiss his cases when time passed with no communication. It was generally his view that Court deadlines were loose and that because the Court would routinely allow him extensions and reinstatements after the fact, he did not have to follow the Court's deadlines. Tr. at 127.

In *Delavaga v. Ashcroft*, No. 03-40164-ag, the Court's docket shows petitioner's brief due on June 28, 2004, and a phone call to DeMarco's office on July 6, 2004 (a week later), inquiring about its status. DeMarco testified that his office did not inform him of this call, Tr. at 141, and it appears that no one from his office responded to the court. Given Ms. [Manager]'s testimony that Ms. [Paralegal] admitted not reporting issues to DeMarco, Tr. at 260, it is quite possible that Ms. [Paralegal] did not inform him of the court's call. As DeMarco makes no claim that she acted maliciously in any way, Tr. at 261, however, it seemed unnecessary to the Committee to resolve the issue, as either way, the office's failure to respond to the court remained entirely DeMarco's responsibility. After receiving a letter from the AUSA, on July 29, 2004, DeMarco wrote the clerk, asserting that he had never received the scheduling order. The Court then issued a show cause order, stating that failure to respond within 20 days would result in dismissal and referral to the court's disciplinary committee. Order of August 4, 2004. DeMarco apparently did not respond, and he asserts that he never saw this order because his paralegal did not show it to him. Tr. at 157-58. A second show cause order was then issued on November 8, 2004.

Although DeMarco claimed he filed a response to this second order, the court apparently did not receive it, in the form of a motion to extend time, until February 15, 2005.

DeMarco had no explanation for why he did not file a response to the first show cause order; he did, however, note that his office did not always receive notices from the Court, Tr. at 144, and he opined that was the problem here. DeMarco also produced evidence that his office had received a scheduling order from a case in which his office was not involved on at least one occasion. Exhibit 7 to Letter Response. [Associate-A] also confirmed that there were problems with things get lost on the clerk's side at this time. Tr. at 321. As to the failure to follow up when his motion to extend time in November 2004 was not acted on, DeMarco explained that his office routinely re-calendared due dates when a motion to extend time was filed, without any follow up to be sure that the motion was granted. Tr. at 146. Further, he admitted that his office would not even abide by the extension date he requested. His practice was to file the motion and then wait for the government or the court to get back to him before taking further action. The office had no system in place to follow up when a motion to extend time was filed. Tr. at 147-49. Ms. [Manager] confirmed the absence of any reminder system or electronic database, Tr. at 245-46. At the time, DeMarco did not believe there was anything wrong with his practice. Tr. at 153-55.

*Thaqi v Ashcroft*, No. 03-40629-ag, was dismissed pursuant to CAMP for failure to comply with the scheduling order.[7] Order of Oct. 17, 2005. DeMarco testified that he never received the Court's scheduling order. Tr. at 160. His motion to reopen the case was denied on March 8, 2006, because the court determined that no manifest injustice would result. DeMarco testified that he determined the case had no merit, so he did not pursue it. Tr. at 161-62.

A similar pattern occurred in *Zuleta v Ashcroft*, No. 03-40944. Petitioner's brief was due July 9, 2004, but was not filed. DeMarco asserted that he did not receive the scheduling order. Tr. at 166. The Court issued a show cause order on August 10, 2004, with the same warnings as the August 4 order in Delavaga above. DeMarco admitted that he saw the show cause order in this case, although

---

[7] The brief had been due on May 27, 2004.

he cannot explain why his paralegal would have given him this order when he claimed she had not given him the August 4 Delavega show cause order. He responded to this order by letter dated August 27, 2004 (after the 20 days given by the Court in its August 10 order), explaining that he had not received the scheduling notice. The court set a new date of September 27, 2004, for the petitioner's brief, but the brief was not filed until the following day, September 28.

In *Boci v. Gonzalez*, No. 05-6586-ag, the Court dismissed the appeal for failure to comply with the scheduling order. DeMarco claimed that the client had terminated his services and hired a new attorney. Letter Response at 4. Although he also claimed no wrongdoing, DeMarco did nothing to notify the Court, and no new attorney ever entered an appearance. In fact, the case was dismissed following a letter from the AUSA requesting default for failure to file a brief.

Similarly in *Jajdari v. Gonzales*, No. 06-1095, the appeal was dismissed for failure to comply with the scheduling order. DeMarco asserted that the client moved to Canada and abandoned the appeal, but he did not notify the Court that the case was moot. Tr. at 212-14.

*Abajlal v Gonzales*, No. 06-3242-ag, was dismissed on October 3, 2006, because the petitioner's brief due September 14 had not been filed. The dismissal was later vacated. DeMarco did not recall the circumstances of this case, although he asserted only that the Court noted the dismissal was entered in error (although the date for filing the brief had passed).

In summary, the Court issued three show cause orders in two cases to DeMarco in 2004: 1) August 4, 2004, in Delavega, 2) August 10, 2004, in Zuleta, and 3) November 8, 2004, again in Delavega. A month later, on December 7, 2004, in Darji, which was eventually successfully resolved by stipulation, the Court noted the possibility that it would refer DeMarco to this Committee for his conduct if he did not comply with the order instructing DeMarco to respond within 20 days. The Court then entered the scathing order, discussed above, in June 2008 in Morales. Despite all these orders, DeMarco testified that he did not realize there was such a problem with the Second Circuit until he received the

referral order from this Committee in June 2009. Tr. at 199-200. (Notably, DeMarco did not act on the Court's Referral Order when it was first sent in June 2009, but only responded when he received the second letter notifying him the Committee would proceed without his input.) Although DeMarco testified that he believed his paralegal may have been opening the mail and not showing him these orders, DeMarco also testified (and produced documents to prove) that he saw and responded to two of them (Zuleta and the second Delavega order). However, whether he saw the other orders and ignored them or whether his supervision of his staff was so poor that he never saw them, the Committee is deeply disturbed by DeMarco's attitude towards the Court and its procedures, as well as his lack of supervision of his staff. It is important to note that despite the repeated explanations DeMarco gave at Hearing, noting that his paralegal or another staff member had caused the error or neglected to inform him of a situation, DeMarco did not use those explanations as an attempt to evade responsibility.[8] He knew, and the Committee has found, that he is responsible for all of the neglect described above, whether caused by his direct inaction or the indirect inaction of a person he was supposed to supervise.

### 3. Alleged Misrepresentation

In responding to the Court in two instances in 2008, DeMarco asserted that he did not have a pattern of violating court orders, despite his having by then failed to file Form C/A and timely briefs on numerous occasions. In the first affidavit, his reference to not missing a filing deadline appears in context to refer to not missing a deadline for filing a petition for review (as opposed to deadlines in scheduling orders), It does appear accurate that prior to the Morales case (and since), DeMarco's office had never missed the deadline for filing a petition for review. From his testimony, the Committee is convinced that he properly understands the importance of meeting jurisdictional, or as he called them "pants

---

[8] DeMarco testified at one point, "I don't mean to sit here and say this is all [Paralegal]'s fault. It's not. She shouldn't have been given that level of not authority but she shouldn't have been given that level of responsibility." Tr. at 33. After explaining how his office relied on the Court's repeated practice of granting extensions after the fact, DeMarco admitted, "I am not blaming the court staff. It was totally our fault." Tr. at 96.

on fire" deadlines, and that this missed deadline was a mistake and not part of a pattern.

The reference in the second affidavit to not violating court orders is more general and seems to have been based on a misunderstanding of the severity and extent of his office's conduct. As discussed above, because the briefing schedule is set by a document termed a court order, DeMarco had, in fact, violated court orders, as well as rules of the court, at the time he made this representation. However, both the Form C/A and the briefing schedule are administrative matters, and DeMarco credibly testified that at the time he did not realize that his office had a pattern of missing these deadlines, nor did he consider the failure to file documents within the dates listed in the scheduling order as a violation of a court order. He saw the administrative scheduling deadlines as distinguishable from a direct order from a judge to take or refrain from taking a particular action, just as they are distinguishable from a jurisdictional filing deadline that bars an appeal. It is clear from both DeMarco's testimony and that of many other respondents to this Committee that many attorneys did not consider the failure to meet court timelines, or the practice of allowing a case to "die a natural death" rather than properly dismissing it, as a violation of a court order. Additionally, Mr. DeMarco's office had fallen into a habit of waiting for the court clerk's office to contact them if something was missing, and then responding, and did not understand that practice as violating a court order. While the Committee does not condone these practices, it recognizes that DeMarco's assertion that he had never violated a court order was not intentionally untruthful, nor was it intended to mislead the Court.

## VI.    Recommendation

### A.    The Committee Recommends a Public Reprimand

The Committee has not found, on this record, any evidence that DeMarco intended any harm to his clients. In fact, although DeMarco did not focus on this argument, a case can be made that delaying an immigration appeal by seeking extensions, or allowing the case to die a natural death rather than dismissing it, may actually further, rather than injure the client's interest, particularly if a stay remains in place while the appeal is pending. However, DeMarco did not

40

profess the best interest of his client as his primary motivation, and the record does show a disturbing pattern of inattention, poor supervision of his staff, and cavalier attitudes towards court orders and procedures that are inconsistent with expectations for an attorney of DeMarco's experience.

The record in this matter demonstrates clearly and convincingly that DeMarco has repeatedly failed to comply with the Court's rules, including the filing of the Form C/A, and its orders, particularly scheduling orders. While the Committee has some concern about DeMarco's explanations of his changes in office practices, as he seems to continue to rely on the skills and knowledge of his lay staff without providing them any training or adequate supervision to ensure their compliance with court rules and orders, no further problems have arisen since the Court's 2009 referral order.[9] Since he began to understand the problem, he has complied with scheduling orders and not missed deadlines, so the changes to his practice appear to have been functionally effective.

In almost all instances, DeMarco has asserted or speculated that the reasons for his failures to meet deadlines and court orders were due to the action or inaction of a paralegal working under his direction, Ms. [Paralegal], to whom he had admittedly delegated a good deal of responsibility for complying with the procedural rules of this Court. Nonetheless,"[t]he essence of the legal assistant's role is that he or she may perform any delegated duty, under the supervision of a

---

[9] While finalizing this Report and Recommendation, the Committee learned of two additional situations that could have been part of the Court's referral order. In a summary order in *Yacoub v. Holder*, No, 08-3053, the Court criticized DeMarco's brief as essentially being of poor quality. Then, in June 2009 (after the Court's Referral Order was issued, but before DeMarco apparently received it), the case of *Dolphin Direct Equity Partners, LP v. Interactive Motorsports and Entertainment Corp.*, No. 09-1359, was dismissed for failure to file forms C& D. The Dolphin case appears to have been re-filed as No. 10-1547 in 2010, and a mandate was issued on May 2, 2011. Because DeMarco was not given an opportunity to respond to these two cases, they are not included in the Committee's recommendation, but even if included, the Committee believes that they appear to represent similar problems to the specifics already addressed and are consistent with the Committee's recommendation.

lawyer who is responsible to the client and any tribunal for the assistant's acts." NYCLA Eth. Op. 666 (N.Y. Cty. Law. Assn. Comm. Prof. Eth.) (1985) (emphasis added). Although the Committee was unable to obtain the voluntary testimony of Ms. [Paralegal] to hear her perspective on the extent of supervision provided, and decided that subpoenaing her testimony in Georgia was not indicated, DeMarco himself has admitted that he failed to supervise, and perhaps even gave improper direction, to his assistant. Regardless of what her testimony would have been, it is clear that DeMarco's supervision was inadequate. Although the Committee would have taken Ms. [Paralegal]'s testimony had she been reasonably available, even without it, the Committee has clear and convincing evidence of DeMarco's neglect. Both Mr. [Associate-A] and Ms. [Manager] testified that they received adequate supervision and training, but neither of them dealt extensively with Second Circuit cases.

The Committee is troubled by DeMarco's explanations that he was not properly supervising his staff but that his new paralegal is a much more reliable employee, that he encouraged the attitude of all is well that ends well, and that he admitted that he did not know what he was doing in the appellate court. *See* D.R. 6-101(A)(2) ("A lawyer shall not . . . [h]andle a matter without preparation adequate in the circumstances"); N.Y. Rules of Prof'l Conduct R. 1.1 (effective April 1, 2009) ("A lawyer should provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."); D.R. 1-104(B); 22 N.Y.C.R.R. § 1200.5(B) ("A lawyer with management responsibility in the law firm or direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the disciplinary rules."); N.Y. Code D.R. 1-104(C); 22 N.Y.C.R.R. § 1200.5(C) ("A law firm shall adequately supervise, as appropriate, the work of partners, associates and nonlawyers who work at the firm."); *see also* N.Y. Rules of Prof'l Conduct R. 5.1, 5.3 (effective Apr. 1, 2009).

Mr. [Associate-A]'s testimony confirmed DeMarco's assertions that his office procedures-for example, the absence of an office tickler system-were lacking, but that DeMarco generally had an appropriate attitude toward court deadlines, encouraging his staff to meet them. At the time, he was employed, Mr. [Associate-A] was a new attorney with no experience in appellate work at the

Second Circuit. He believes that he would have discussed any communications from the Court or missed deadlines with DeMarco, but also insists that no deadlines were ever missed on cases on which he worked. His assertions generally support DeMarco's position that no one in the office understood the communications from the Second Circuit about missing C/A forms and briefs as anything other than the appropriate court procedure. Thus, it appears, that DeMarco did not properly train his staff in how to deal with the Second Circuit's procedures, although they may have received appropriate instruction for handling other proceedings.

Most importantly, regardless of who in his office performed, or failed to perform an act, the Committee has found, by clear and convincing evidence, that DeMarco failed to timely file briefs and properly comply with court orders. Even while attempting to explain his failures by his reliance on others, at the Hearing, DeMarco did acknowledge responsibility for these failures.

Given DeMarco's admission of responsibility, the absence of complaints by any clients, and the fact that the Court appears to have taken steps to ensure that despite DeMarco's failings, briefs were accepted out of time and some dismissed cases reinstated, the Committee accepts DeMarco's representation that while there was potential for harm to his clients, it did not rise to a level that would warrant more serious discipline. It appears that Mr. DeMarco has taken the Court's referral seriously and has taken steps to ensure that court orders are met. On balance, the Committee believes that DeMarco's deficient and sometimes negligent conduct warrants that he be publicly reprimanded.

## B.    Conclusion

The Committee recommends that Mario DeMarco be publicly reprimanded for the conduct set forth above. In addition, he should be required to complete no fewer than six hours of CLE in law office management, from a CLE provider accredited by the bar of New York, in addition to the required hours of CLE.

Finally, DeMarco should be required, in connection with his practice in any federal court in the Second Circuit or in any federal administrative agency whose action is subject to the Second Circuit's review, to submit to the Committee sworn

43

statements identifying under oath each and every instance during each of the four reporting periods described below in which: (1) a submission is not filed or is filed out of time; or (2) an application is made for permission to make a late filing only after the due date has passed. It is expected that these reports will show no such instances absent exigent circumstance, which circumstances should be attested to under oath in the respective report.

In the event that a report is not timely filed or reveals deficiencies not justified by exigent circumstance, the Committee may recommend the imposition of additional discipline, including but not limited to further suspension from the Second Circuit, without hearing further testimony.

The following reporting periods and deadlines shall be observed. The report for each reporting period shall be mailed to the Committee Secretary within ten (10) days of the end of that reporting period. The first reporting period shall commence 10 days after the Committee's recommendation is mailed to DeMarco and shall end six months after the Second Circuit issues its order of disposition in this matter. Each of the three subsequent reporting periods shall be for a reporting period commencing at the end of the prior reporting and ending six months later. A total of four reports shall be prepared and mailed to the Committee Secretary.

The dissent asserts that DeMarco should be subjected to a period of suspension, but the majority of the Committee disagrees. A public reprimand with the reporting required above is a serious sanction for a lawyer and is not just a slap on the wrist. While DeMarco clearly engaged in the improper conduct for a period of time before this Court that is described above, he has accepted responsibility, made major corrective changes in his practice, and has had no repetition of the conduct in the last three years. He has appeared before a panel of this Committee on three separate occasions and has willingly (and without rancor) cooperated with the Committee. Additionally, the problems appear to have arisen out of neglect, not out of any intention to harm others or obtain undue benefit for himself, such as would justify the more serious sanction of suspension.